Nott, J.,
delivered the opinion of the Court.
This is an action brought by the deputy surveyors of the surveyor general of Kansas to recover $5,300 upon contracts for the survey of certain lands in the Delaware reservation.
In the case of William Clark v. The United States, (January 22, 1866,) this court said :
“We are all agreed that the mass of matter transmitted with the petition by Congress, and printed as a part of the record in the case, is • not thereby made evidence. On the contrary, we think that only such documents should ho printed in such cases as are made by proper references in the petition a part of the petition, or such documents as may be agreed upon by stipulation between the parties, or such as the *337 claimant deems to be properly authenticated, and desires to put in evidence.
“ A claimant may manufacture any amount of irrelevant testimony and present it to Congress, and Congress may transmit it as a part of his case to this court, but Congress does not thereby make irrelevant matter relevant, nor enact that incompetent evidence is competent; and there is neither necessity nor propriety in this court including in the printed record of the case testimony which we must immediately reject as inadmissible.”
And in the case of Jones & Brown v. The United States, (February 14, 1866,) we held that in this court a claimant is not a competent witness in his own behalf in an action brought against the United States.
Under the rules established by these cases, we now exclude as inadmissible the following instruments and testimony which the claimants have offered-in evidence:
1. The certificate given by the surveyor general to the claimants, dated April 26,1861, and annexed to the petition, it being neither an official report nor a voucher given in the ordinary course of his official duty.
2. The ex parte affidavits and communications marked 7, 8, 9,' 10, 11, 12, 13, also annexed to the petition.
3. The depositions of the claimants Haun & Hackbush.
4. We also exclude as irrelevant all of the conversations and communications between the surveyor general and the witness Heuningray ; and also, as secondary, the parol evidence offered to show the contents of the written bid of Spencer, Bringhurst & Simpson.
In the Clark case we also said:
“There may be documents among such transmitted papers that would be admissible if properly authenticated; and such there appear to be in this case; but inasmuch as these have been referred to in the three trials of the action, and inasmuch as the solicitor of the United States has raised no objection to them, and, on the contrary, has used some of them as evidence, we must conclude that he is satisfied of their 'authenticity, or that some stipulation has been .entered into between the parties which does not appear upon the printed record. In other words, we accept as admissible such of these documents as we find to be relevant and competent evidence.”
And regarding that ruling as not inapplicable to this- case, we admit under it—
*338 1. The protest appended to Spencer, Bringhurst & Simpson’s contract.
2. The communications of the surveyor general, addressed to the claimants, dated September 15 and December 21,1860.
3. The communications of the Commissioner of Indian-Affairs and the Commissioner of the Land Office, dated August 28 and 29, 1860.
4. The offer or bid of the claimants, dated September 8, 1860.
After the exclusion of this incompetent and inadmissible evidence these facts appear, viz :
The Commissioner of Indian Affairs (August 28,1860) requests the aid of the General Land Office to procure the immediate survey of Indian lands in 'Kansas, and designates the surveyors by whom he wishes the survey made. The Commissioner of the Land Office accordingly (August 29, 1860) issues' the necessary order to the surveyor general of Kansas, wherein are given these positive instructions :
“ Having acceded to the suggestions of the Acting Commissioner of Indian Affairs, that Messrs. William Spencer, Albert O. Bringhurst, and German IT. Simpson be the surveyors of the work hereinbefore mentioned, for the reason that the lands to be surveyed are under the control of the Indian Office, you are required to enter into contract with these gentlemen, or either of them, for the accomplishment of the work contemplated by the provisions of the treaty of May 20, 1860, with the single discrimination in favor of Mr. Simpson, who it is desired should have contract for the subdivision of the lands to be allotted to the individual members of the tribe.
“Upon the receipt hereof you are directed to enter immediately into ■ the contracts for the surveys at the usual lowest-legal rates.”
Instead of complying with his instructions, the surveyor general first invites proposals and then enters into a formal contract with the claimants, (September 12, I860,) to establish and survey the subdivisional lines in certain enumerated townships within the boundaries of the Delaware reservation, estimated at 950 miles, and to establish thereon the proper corners, at the rate of $5 per mile.
The -agreement refers to special instructions of the same date which are made a part of the contract. In these special instructions is this-further agreement:
“ In making the above surveys, if any of the corners on the township lines at which you are required to close your section lines are not to be found, you will retrace such portion of the township lines as will enable you to correctly re-establish • such missing corners, These notes you are to keep separate and distinct from the notes of your sub *339 division lines, and are to be returned to this office, accompanied by such oatbs "and affidavits as are required with the returns of township notes. For this work you will be allowed at the rate of seven dollars per mile for every mile or part of a mile actually run and measured, random lines and offsets not included.”
There is also another letter, of the same date, from the surveyor general to the claimants, containing the following instructions and provisions :
“ Before proceeding to the survey of .the subdivisional lines embraced in your contract, you are hereby instructed to survey, mark, and set off to the Delaware tribe of Indians one hundred and one thousand six hundred and eighty acres of land.
“In making the survey required by these instructions you will freely consult with the agent of the Delawares for the purpose of conforming to the interests of the tribe, so far as practicable. Your compensation will be six dollars per diem and expenses; just and reasonable expenses only are intended.”
The Commissioner of the General Land Office, on being informed of this contract with the claimants, disapproves of the action of the surveyor general, and reprimands him for not having complied with his instructions. He also (September 20, 1860) orders him to cancel the contract made with the claimants. The surveyor general transmits to the claimants this order, and notifies them that their contract is can-celled October 9, 1860.
When this notice is received by the claimants, they have performed one-third of the work under the first contract, viz : about three hundred miles of the survey. Notwithstanding the notice, they go on and complete the work called for by their contract, and demand payment therefor according to its terms. Payment is refused, and they appeal to Congress for relief, and Congress transmits their petition to this court. The claimants do not allege in their petition what their profits might have been on the two-thirds of the work remaining unperformed at the time they were ordered to discontinue; neither do they offer any evidence thereof on the trial, but stand upon their contract, and, alleging full performance, demand the full consideration thereof.
As to that part of the claimants’ ease which is founded on the surveyor general’s instructions, to set off to the Delaware Indians 101,6S0 acres of land at #6 per diem, and expenses, amounting to #760 25, and as to that part which is for retracing township lines and re-establishing missing corners, at the rate of #7 per mile, amounting to #70, *340 the evidence fails to establish a performance on tbe part of the claimants, or to furnish facts from which the court could estimate damages. With regard to so much of the case as is founded on the formal contract for running the subdivisional lines in the described townships, at the rate of $5 per mile, and amounting, as it is insisted, to $4,615, we have arrived at the following conclusions : •
By the “ act to establish the offices of surveyor general of New Mexico, Kansas,” &c., (July 22, 1854, 10 Stat. L., 308,) the President is to appoint “ a surveyor general for the Territories of Nebraska and Kansas, * * * whose duties, powers, obligations and responsibilities, and compensation, shall be the same as those of the surveyor general of Wisconsin and Iowa;” section 10. And it is further enacted, that the “ said surveyor general shall cause the necessary surveys to be made in said Territories of standard meridian, base, and paralle lines, and of township and subdivisional lines, under such rules and regulations as shall be prescribed by the Commissioner of the General Land Office;” section 11.
By the “ act to create the office of surveyor of public lands in the Wisconsin Territory,” (June 12, 1838, 5 Stat.L., p.243,) it is enacted that “ a surveyor general for the Territory of Wisconsin shall be appointed, who' shall have the same authority and perform the same duties respecting the public lands and private land claims in the Territory of Wisconsin as are now vested in and required of the surveyor of the lands of the United States'in Ohio;” section 1. And the “act to equalize the compensation of surveyor generals,” &c., (August 8, 1840, 9 Stat. L., p. 79,) enacts that “ the surveyor general of Wisconsin and Iowa, and the surveyor general of Arkansas, shall receive the same annual salary as the other surveyor generals of the public lands of the United States ;” section 1.
By the “ act providing for the sale of lands of the United States in the territory northwest of the river Ohio,” &c., (May 18,1796, 1 Stat. L., p. 464,) it is enacted that “ a surveyor general shall be appointed, whose duty it shall be to engage a sufficient number of skilful surveyors as his deputies,” (section 1,) and that “the President of the United States may fix the compensation of the assistant surveyors, * * *' provided, that the whole expense of surveying and marking the lines shall not exceed $3 per mile,” &c.; section 10.
This limitation on the cost of surveys is supposed to have been rescinded, with regard to the lands in Kansas, by the 9th section of the “ act to establish the offices of surveyor general of New Mexico, Kansas, and Nebraska,” (10 Stat. L., 309,) which declares “if hat full *341 power and authority are hereby given to the ¡Secretary of the Interior, to issue all needful rules and regulations for fully carrying into effect the several provisions of this act.” Under it instructions were'issued to the surveyor general of Kansas, dated August 26, 1854, by the Commissioner of the General Land Office, which fixed the compensation of deputy surveyors at $5 per mile for sectional lines, and $7 per mile for township lines, &c. These instructions were ratified by the Secretary of the Interior September 2, 1854; and as Congress has repeatedly made appropriations for carrying them into effect, we may consider them as having received a legislative sanction.
It would appear, therefore, that the surveyor general of Kansas might contract with the claimants unless limited by other statutes.
By the “ act to reorganize the General Land Office,” July 4, 1836, (5 Stat. L., p. 107,) it is enacted “ that the executive duties now prescribed, or which may hereafter be prescribed by law, appertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such public lands, and also sueh'as relate to private claims of land, * * * shall be subject to the supervision and control of the Commissioner of the General Land O ffice section 1.
If any doubt existed as to the authority of the Commissioner over the surveyor general, it would be set at rest by the construction which the Supreme Court has given to this statute in the cases cited by the deputy solicitor. (Barnard’s Heirs v. Ashley’s Heirs, 18 How., 43; Bell v. Hearne, 19 Id., 262.)
But further -than this, these lands came within the provisions of the treaty with the Delawares, May 6, 1854, (10 Stat. L., p. 1048.) By the “ act to provide for the appointment of a Commissioner of Indian Affairs,” &c., (4 Stat. L., p. 564,) he is invested with “ the direction and management of all Indian affairs and of all matters arising out of Indian relations ;” section 1. And it was not until the act of 1864 that the survey of Indian lands was placed “ under the direction and control of the General Land Office.” (13 Stat. L., p. 40, see. 6.) This survey of these lands came within the jurisdiction, therefore, of the Commissioner of Indian Affairs. He designated, as it was his right and duty to do, the surveyors by whom the work was to be done, and merely asked the intervention of the Land Office to secure the aid and supervision of the surveyor general.
When the surveyor general entered into the. contract with the claimants he violated the instructions of his superior, the. Commissioner of the General Land Office. But he had at law a general authority to contract with his deputies, and at that time it was not necessary that *342 his instructions should be made a part of the contract, or that the contract should be approved by the Commissioner of the Land Office. Those requirements were imposed a year later by the act of 1862, (12 Stat. L., p. 409,) and do not affect this contract.
Neither does the evidence show that the claimants knew that the surveyor general was transcending his instructions. If bad faith existed on the part of the contractors, that is a fact which must be established by the defendants, and cannot be presumed by the court. We are of the opinion that the claimants have made out a case, and are entitled to recover.
. But the claimants are mistaken in thinking that the contract price is the measure of their damages. The rule in such cases is, we think, correctly laid down by ihe New York court of appeals, in Clark v. The Mayor, (4 N. Y. R., 338,) and is as follows:
“ Where the contract is terminated by the employer against the will of the contractor, the latter is not confined to the contract price of the work, but may bring his action for a breach of the agreement, and recover as damages the profits he would have made if allowed to complete the work; or he may waive the contract, and bring his action on the common counts for work and labor generally, and recover what the work done is actually worth.”
And the case at bar falls so precisely within that of Clark v. Marsiglia (1 Denio R., 317) that it will be sufficient to quote the opinion there :
“ The defendant by requiring the plaintiff to stop Work upon the paintings violated his contract, and thereby incurred a liability to pay such damages as the plaintiff should sustain. Such-damages would include a recompense for the labor done and materials used, and such further sum in damages as might, upon legal principles, be assessed for the breach of the contract. But the plaintiff had no right, by obstinately persisting in the work, to make the penalty upon the defendant greater than it would otherwise have been.” “In all such cases the just claims of the party employed are satisfied when he is fully recompensed for his part performance, and indemnified for his loss in respect to the part left unexecuted; and to persist in accumulating- a larger demand is not consistent with good faith towards his employer.”
In this case, as has been said, the claimants have proved no profits on the work unperformed when they received notice to discontinue, nor alleged that profits might have been made. We, therefore, limit their relief to the value of the work actually done at that time, which is shown to be about 300 miles, at the contract price of $5 per mile.
Mr. A. L. Merriman for the claimants.
Mr. J. B. Kerr, Deputy Solicitor, for the government.
The judgment of the court is, that the claimants recover $1,500 damages.
Judge LoRnvé did not sit in this case.